### A00A0823. OGLETHORPE POWER CORPORATION v. HARTWELL ENERGY LIMITED PARTNERSHIP.
(537 SE2d 372)

RUFFIN, Judge.

Hartwell Energy Limited Partnership (the Partnership) sued Oglethorpe Power Corporation, seeking a declaratory judgment that a certain stock transfer did not trigger Oglethorpe's right of first refusal under an agreement between the parties. The trial court granted summary judgment to the Partnership, and Oglethorpe appeals.[1] For reasons discussed below, we affirm.

The essential facts in this case are undisputed. In June 1992, Oglethorpe and the Partnership entered into a long-term agreement (the Agreement), under which Oglethorpe agreed to purchase electric power generated from the Partnership's production facility in Hart County. At the time the Agreement was executed, the Partnership had one general partner and one limited partner, both of which were ultimately controlled by Transco Energy Company through a chain of

---

[25] *Butler,* supra. See also *DeKalb County v. Orwig,* 261 Ga. 137, 138 (1) (402 SE2d 513) (1991).

[26] Id.

[1] The Partnership also asserted claims for injunctive relief and attorney fees, but the trial court did not address those claims in its order.

subsidiary companies. The Agreement stated that "[t]he continued control of [the Partnership] by Transco Energy is a material factor in Oglethorpe Power's willingness to assume certain risks attendant to this Agreement," and prohibited Transco Energy or its affiliates from selling their interests in the Partnership without Oglethorpe's consent. The Agreement also gave Oglethorpe a right of first refusal in the event that the Partnership or one of its "Affiliates" desired to sell a "Transfer Interest," as such terms were defined in the Agreement.

In two subsequent transactions, with Oglethorpe's consent, Transco Energy sold fifty percent of its interest in the Partnership to Destec Energy, Inc. and the remaining fifty percent of its interest to another entity. Following these transactions, Destec indirectly controlled fifty percent of the partnership interests through two wholly owned subsidiaries: Hartwell Independent Power Partners, Inc., which owned a one percent general partnership interest in the Partnership, and Hart County, IPP, Inc., which owned a forty-nine percent limited partnership interest. The remaining fifty percent of the partnership interests was controlled by a British company, National Power, LLC, one of whose subsidiaries owned a one percent general partnership interest and another of whose subsidiaries owned a forty-nine percent limited partnership interest.[2]

Destec was a publicly traded company, 80 percent of whose shares were owned by The Dow Chemical Company. Destec in turn had dozens of subsidiaries through which it controlled power plants throughout the United States, including the two subsidiaries that together owned fifty percent of the Partnership.

In June 1997, Dow entered into an agreement to sell its 80 percent interest in Destec to NGC Corporation. Pursuant to this agreement, a special purpose subsidiary, NGC Acquisition Corporation II, was created, which then merged with Destec. The surviving entity was also called Destec Energy, Inc. and was wholly owned by NGC Corporation.[3] Thus, following the merger, NGC Corporation indirectly controlled 50 percent of the partnership interests in the Partnership.[4] Oglethorpe contends that the sale of Dow's 80 percent interest in Destec to NGC Corporation triggered Oglethorpe's right of first refusal under the Agreement.

Interpreting the right of first refusal agreement requires sorting through several cross-referenced contract provisions and definitions.

---

[2] This ownership structure is illustrated in an attached chart, which Oglethorpe prepared and the Partnership acknowledged was correct.

[3] In addition to acquiring Dow's interest in Destec, NGC Corporation apparently purchased the remaining 20 percent of Destec's stock from the various other shareholders.

[4] The post-merger ownership structure is illustrated in an attached chart, which was also prepared by Oglethorpe and acknowledged by the Partnership.

The right of first refusal is set forth in Section 13.3 of the Agreement, which gives Oglethorpe a right of first refusal to purchase any "Transfer Interest" under certain conditions that follow. Section 13.3.1 states that

> [i]f [the Partnership] or any of its Affiliates ever desires to dispose of its or their right, title, or interest in a Transfer Interest, or receives an offer to purchase a Transfer Interest, which offer the transferring party is prepared to accept, [the Partnership] shall give notice thereof to Oglethorpe.

For a period of 180 days after receipt of the notice, Oglethorpe "shall have the right to exercise its right of first refusal on the same terms and conditions as provided in [the Partnership]'s notice."

The term "Transfer Interest" is defined as either an "Asset Transfer Interest" or an "Equity Transfer Interest." The definition of "Asset Transfer Interest" is not relevant in this case. An "Equity Transfer Interest" is defined as

> any sale, transfer or other disposition by any General Partner of its general partnership interest or any part thereof that would result in its holdings after such sale being less than fifty percent (50%) of the total general partnership interests in [the Partnership] or by any Shareholder of any voting stock in the General Partner that would result in such Shareholder holding less than fifty percent (50%) of the outstanding voting stock in such General Partner; provided, however, that upon any sale, transfer or other disposition of stock in a General Partner that results in Affiliates of Transco Energy holding no more than fifty percent (50%) of the outstanding voting shares of the General Partner, any subsequent sale, transfer or other disposition of a general partnership interest in [the Partnership] shall also be an Equity Transfer Interest. Likewise, upon any sale, transfer or other disposition of a general partnership interest in [the Partnership] that results in Affiliates of Transco Energy holding no more than fifty percent (50%) of the outstanding voting shares of the General Partner, any subsequent sale, transfer or other disposition of voting shares of a General Partner shall also be an Equity Transfer Interest.[5]

---

[5] The Agreement's use of cross-referencing creates some confusion. Although Section 13.3, the first refusal provision, states that the "Transfer Interest" is the item being sold or disposed of, the term "Transfer Interest" is defined elsewhere as the sale itself. Thus, read literally, the right of first refusal is triggered by the sale of an interest in the sale of an interest in the Partnership.

In order to trigger the right of first refusal, therefore, the proposed sale, transfer, or other disposition must satisfy at least two conditions: (1) it must be a disposition by the Partnership or one of its Affiliates, and (2) it must be a disposition of the Partnership's or Affiliate's right, title, or interest in a Transfer Interest. The term "Affiliate" is defined as

> any other entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified entity. For purposes of this definition, "control" when used with respect to any specified entity means the power to direct the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "control" have meanings correlative to the foregoing.

Because the disposition allegedly triggering the right of first refusal was the sale by Dow of its stock in Destec, we must first determine whether Dow was an "Affiliate" of the Partnership. If it was not an Affiliate, then it is immaterial whether the transfer constituted an Equity Transfer Interest. To qualify as an Affiliate, Dow must directly or indirectly have had "the power to direct the management and policies of" the Partnership. At the time of the transfer, Dow indirectly controlled at most 50 percent of the partnership interests through its majority ownership of Destec. Thus, Dow did not, even indirectly, have a majority ownership position in the Partnership. Indeed, as Oglethorpe admits, the initial sale by Transco Energy of a 50 percent interest to Destec was specifically intended to leave neither company in control of the Partnership for accounting purposes, thus allowing both companies to avoid including the Partnership's liabilities on their balance sheets.

The partnership agreement vests the "management and control of Partnership affairs and business" in a four-member management committee, two members of which are appointed by each general partner. The consent of all four members is required "for any act or decision of the Management Committee." Except as specifically authorized by the management committee or the partnership agreement, "no General Partner shall transact any business of the Partnership or have any power to sign for or bind the Partnership." Thus, it is apparent that Dow did not, by virtue of its indirect control of 50 percent of the limited and general partnership interests, have the "power to direct the management and policies" of the Partnership. Oglethorpe does not point to any evidence showing that Dow had such power and does not even assert in its appellate brief that Dow

had such power. Indeed, Jeffrey Stair, one of Oglethorpe's designated representatives pursuant to OCGA § 9-11-30 (b) (6), testified that "none of those four entities there[, i.e., the Partnership's two general partners and two limited partners,] would have the ability to control; therefore, they wouldn't be affiliates."

Although it does not claim that Dow had the power to direct the management and policies of the Partnership, Oglethorpe argues that it should nevertheless be considered an Affiliate because otherwise, "the Partnership would have no Affiliates after the 50% swap[, i.e., Destec's purchase of a 50 percent interest from Transco Energy,] was made." This argument misses the point. The intent of the parties is to be determined at the time the contract was made,[6] and the Agreement was entered into well before Transco Energy, with Oglethorpe's consent, sold a 50 percent interest to Destec. At the time the Agreement was entered into, there were clearly entities that fit the very specific definition of "Affiliate" set forth in the Agreement, so it cannot be said that the term was without meaning at that time. The fact that, as a result of *subsequent* transactions, the Partnership was left with no such Affiliates says nothing about the parties' intent at the time the contract was made.

Unless a contract is ambiguous, and the ambiguity cannot be resolved by application of the rules of construction, contract construction is a matter for the court.[7] "Ambiguity in a contract may be defined as duplicity, indistinctness, an uncertainty of meaning or expression."[8] "If the contract does not require disentanglement of the language by a jury, i.e., the words used are plain and clear in their common usage, it remains the duty of the trial court to look to the language of the contract with a view to effectuating the intent of the parties."[9] The parties in this case were very specific in their definition of "Affiliate" and in their limitation of the right of first refusal to sales by the Partnership itself or by one of its Affiliates. Because Dow did not have the "power to direct the management and policies of" the Partnership, it was not an Affiliate and its sale of stock in its subsidiary did not trigger the right of first refusal. Accordingly, the trial court properly granted summary judgment to the Partnership and denied summary judgment to Oglethorpe.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

---

[6] See *AFLAC, Inc. v. Williams*, 264 Ga. 351, 354, n. 5 (444 SE2d 314) (1994); *Dooley v. Dun & Bradstreet Software Svcs.*, 225 Ga. App. 63, 65 (1) (483 SE2d 308) (1997).

[7] See *Sagon Motorhomes v. Southtrust Bank of Ga., N.A.*, 225 Ga. App. 348, 349 (484 SE2d 21) (1997).

[8] *Travelers Indem. Co. v. A. M. Pullen & Co.*, 161 Ga. App. 784, 789 (6) (289 SE2d 792) (1982).

[9] *Bd. of Regents &c. of Ga. v. A. B. & E., Inc.*, 182 Ga. App. 671, 673 (357 SE2d 100) (1987).

DECIDED JULY 7, 2000.

*Autry & Horton, Kenneth T. Horton, Jr.*, for appellant.
*Alston & Bird, William H. Hughes, Jr.*, for appellee.