## A07A1727. SIMPSON v. PENDERGAST.
(659 SE2d 716)

RUFFIN, Judge.

Steve Simpson and Joseph Pendergast are two of the four shareholders in Historic Motorsports Holdings, Ltd. ("HMH"). Pendergast brought an action for declaratory judgment and specific performance against Simpson, seeking to require Simpson to sell his shares in HMH to Pendergast. The trial court granted summary judgment to Pendergast, finding that he "is entitled to specific performance by [Simpson] of [Simpson's] obligation to close the sale

of his shares to [Pendergast]." Simpson appeals, and, for reasons that follow, we affirm in part and reverse in part.

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.[1] We conduct a de novo review of a trial court's ruling on a motion for summary judgment, and we construe the evidence and all inferences and conclusions drawn from it in favor of the nonmoving party.[2] So viewed, the record shows that Pendergast, Simpson, Howard Turner, and Peter McLaughlin are shareholders in HMH. The Shareholder Agreement (the "Agreement") among these four provides the method by which a shareholder may voluntarily dispose of his shares in HMH to the other shareholders. Section 5 of the Agreement states:

> A. The Offeror shall provide to the other Shareholders (collectively, the "Offerees" and individually an "Offeree") a written notice of the intended Disposition specifying the purchase price and other terms and conditions (the "Offer") upon which the Offeror is willing to sell all, but not less than all, of the shares of the Offeror to the Offeree.

> B. Upon receipt of an Offer delivered pursuant to Subsection A, the Offerees shall then be obligated, in accordance with the provision of this Section 5, to either (i) purchase the Offeror's stock upon the terms and conditions contained in the Offer, or (ii) sell to the Offeror all, but not less than all, of the shares of Stock of the Offerees on the same terms and conditions contained in the offer. The Offerees shall give a written notice to the Offeror stating the election of the Offerees within sixty (60) days after receipt of the Offer. Such notice may be given by one or more Offerees on behalf of the others (as herein provided) or jointly. Failure of the Offerees to provide the Offeror within such period of sixty (60) days with a written notice stating that the Offerees have elected to proceed under clause (i) of this Subsection B shall be conclusively deemed to be an election by the Offerees to proceed under clause (ii) of this Subsection B.

The Agreement also provides terms for the sale of shares if one or more but not all Offerees choose to purchase the Offeror's shares.

---

[1] See *Chowhan v. Miller*, 283 Ga. App. 749 (642 SE2d 428) (2007).

[2] See id.

On April 5, 2005, Pendergast sent a letter to the other three shareholders proposing to sell his 258.33 shares in HMH for $1,000 per share, or $258,330, with the following terms and conditions:

The Purchase Price is to be paid by certified check or wire transfer at closing.

The purchasing Shareholder[s] shall cause [HMH] (the "Corporation") to make a distribution pro rata, based on the relative stock ownership in place immediately prior to the closing, to the Shareholders equal to 40% of any taxable income of the Corporation for 2004 plus 40% of any taxable income of the Corporation for 2005 from and including January 1, 2005 and through the date immediately before the date of closing. This distribution shall be made within 30 days following the closing.

The selling Shareholder[s] shall be relieved of the non-competition covenants set forth in Section 10 (i) of the Shareholders' Agreement.

This Offer is based upon a review of the June 30, 2004 financial statements of [HMH]. Accordingly, it is a further condition of the Offer that there shall have been no material adverse change in the financial condition, results of operations[,] or assets of [HMH] from June 30, 2004 through the date of closing.

McLaughlin purchased 78.33 of Pendergast's shares (his pro rata share of the stock). Simpson, however, took the position that Pendergast's offer was invalid because of the terms and conditions placed on the sale, including the "change in the [Agreement] to release [Pendergast's] non-compete obligation." Simpson failed to reply in writing to Pendergast within 60 days; Pendergast therefore contends that he is entitled to purchase Simpson's shares under the terms of the Agreement.

Simpson asserts that the trial court erred in granting Pendergast's motion for summary judgment because: (1) Pendergast's offer did not satisfy the requirements of the Agreement and thus required no written response; and (2) the trial court was not authorized to grant specific performance.

1. The trial court granted summary judgment to Pendergast because Simpson did not respond in writing within 60 days to Pendergast's offer. Simpson asserts that he was not required to respond because a question of fact exists as to what "terms and

conditions" means in the context of Section 5 of the Agreement, and certain terms of Pendergast's offer were not "conforming" terms under the Agreement and thus the offer was not binding on him.

"Shareholder agreements are construed according to the principles of the law of contracts."[3] Contract construction is generally a question of law for the court.[4] We first determine if the contract language at issue is clear and unambiguous; if it is, we enforce the contract according to its terms.[5] When no ambiguity exists, we do not consider parol evidence "to add to, take from, or vary the terms of the written contract."[6] If the contract language is ambiguous, we apply the rules of contract construction to resolve the ambiguity.[7] Only if the contract remains ambiguous after applying the rules of construction is the parties' intent determined by a jury or other factfinder.[8]

" 'Ambiguity in a contract may be defined as duplicity, indistinctness, an uncertainty of meaning or expression.' "[9] The Agreement at issue here requires "a written notice . . . specifying the purchase price and other terms and conditions (the 'Offer') upon which the Offeror is willing to sell all, but not less than all, of the shares of the Offeror to the Offeree." The clear, unambiguous language of the Agreement thus anticipates that an offer to sell will contain "terms and conditions" in addition to the specific purchase price. Simpson argues that he understood that "terms and conditions" meant only "terms of payment, time and place of closing[,] and other technical matters having to do with transfer of shares." But we do not consider any extrinsic evidence of the parties' intent when the contract language is unambiguous.[10] Accordingly, we find that the phrase "terms and conditions" was not ambiguous and that the Agreement contemplated that the parties would attach terms and conditions to any offer made.

Without citing any authority,[11] Simpson argues that Pendergast's terms — specifically, the requirements that taxable income be

---

[3] *Foster v. Ohlwiler*, 266 Ga. App. 371, 375 (1) (b) (597 SE2d 481) (2004).

[4] See *Fulton Greens Ltd. Partnership v. City of Alpharetta*, 272 Ga. App. 459, 462 (612 SE2d 491) (2005).

[5] See id.

[6] (Punctuation omitted.) *Ga. Assn. of Educators v. Paragon Productions*, 238 Ga. App. 681, 683 (1) (520 SE2d 37) (1999).

[7] See *Holmes v. Clear Channel Outdoor*, 284 Ga. App. 474, 476 (2) (644 SE2d 311) (2007).

[8] See id.

[9] *Oglethorpe Power Corp. v. Hartwell Energy Ltd. Partnership*, 244 Ga. App. 859, 863 (537 SE2d 372) (2000).

[10] See *Black Island Homeowners Assn. v. Marra*, 274 Ga. App. 265, 266 (1) (617 SE2d 148) (2005).

[11] In nearly eight pages of argument, Simpson's only citation to case law is a single string cite on the general standard for contract construction.

distributed, that he be allowed to review the financial statements, and that he be given relief from the noncompete agreement — render the offer conditional. But Simpson does not explain how the inclusion of these terms relieves him from his contractual obligation to respond in writing to the offer he received from Pendergast. And "[t]he law allows a party to make a conditional offer."[12] We find nothing in the Agreement permitting a shareholder to disregard a "conditional offer," and, as we have previously stated, "[i]t is the duty of the courts to construe and enforce contracts as made, and not to make them for the parties."[13]

The dispositive issue here is whether the Agreement created an enforceable obligation requiring Simpson to give written notice of how he elected to proceed within 60 days of receiving Pendergast's offer. We find that it did. The parties entered into a contract which clearly set forth the requirement that there be a written response to an offer to sell within 60 days of the offer being received. It is undisputed that Simpson did not respond in writing. Therefore, the trial court did not err in finding the contract provisions enforceable and granting summary judgment to Pendergast.[14]

2. Simpson also argues that the trial court erred in awarding specific performance to Pendergast because (a) Pendergast never tendered the money to purchase the shares; (b) Pendergast is not entitled to equitable relief because he has unclean hands; and (c) the offer is too imprecise to be enforced. Specific performance is an equitable remedy available when "the damages recoverable at law would not be an adequate compensation for nonperformance."[15]

(a) A party seeking specific performance must be ready, willing, and able to perform all provisions of the contract, including any payment.[16] Simpson argues that Pendergast did not tender the money for the purchase of HMH shares to him. " 'But it is a well-established rule that tender before suit is filed may be and is waived where the party entitled to payment, by conduct or declaration, proclaims that, if a tender should be made, acceptance would be refused.' "[17] The evidence in this case shows that Pendergast sent Simpson a letter stating he would bring a certified check for $258,330

---

[12] *Helmly v. Schultz*, 219 Ga. 201, 204 (1) (131 SE2d 924) (1963).

[13] (Punctuation omitted.) *Thornton v. Kumar*, 240 Ga. App. 897, 900 (6) (525 SE2d 735) (1999); see *Hibbard v. McMillan*, 284 Ga. App. 753, 759 (4) (645 SE2d 356) (2007) (parties are "entitled to contract on their own terms without the courts saving one side or another from the effects of a bad bargain").

[14] See *Auldridge v. Rivers*, 263 Ga. App. 396, 398 (587 SE2d 870) (2003).

[15] OCGA § 23-2-130.

[16] See *Holden v. Smith*, 236 Ga. App. 205, 208 (511 SE2d 569) (1999).

[17] Id. at 208-209.

to a proposed closing, and that Simpson responded by letter that he would not sell his shares in HMH. Because Simpson stated that he would not accept Pendergast's tender of the funds, tender has been waived.[18]

(b) Simpson argues that Pendergast is not entitled to equitable relief under the doctrine of unclean hands because he allegedly breached his fiduciary duty as an officer and director of HMH by competing with HMH. Even assuming Simpson's allegations are true, however, they do not relate directly to the transaction at issue here. And in order to bar specific performance, an allegation of unclean hands "must relate directly to the transaction concerning which complaint is made."[19] As Simpson's allegations do not affect the enforcement of the Agreement, the unclean hands doctrine is inapplicable here.[20]

(c) "Specific performance 'is not a remedy that either party can demand as a matter of absolute right and will not be granted in any given case unless strictly equitable and just.' "[21] In a claim for specific performance, the court must determine that the contract is "fair, just and not against good conscience. And whether the price was adequate and whether enforcement of the contract was equitable are questions for the trier of fact."[22] Simpson asserts that, due to the terms attached to it, Pendergast's offer is complex and therefore "inherently . . . unsuitable for enforcement by specific performance."

Here, specific performance of the contract requires action on the part of a nonparty to the action, HMH.[23] Under these unique circumstances, we find that genuine issues of material fact remain as to whether enforcement of specific performance would be "unfair, unjust, or against good conscience."[24] We therefore conclude that the trial court erred in granting summary judgment to Pendergast on his claim for specific performance.[25]

*Judgment affirmed in part and reversed in part. Blackburn, P. J., and Bernes, J., concur.*

---

[18] See *Nowlin v. Davis*, 245 Ga. App. 821, 822 (2) (538 SE2d 900) (2000).

[19] *Zaglin v. Atlanta Army Navy Store*, 275 Ga. App. 855, 858 (2) (622 SE2d 73) (2005).

[20] See id.

[21] *Henry v. Blankenship*, 275 Ga. App. 658, 662 (2) (621 SE2d 601) (2005).

[22] (Citations and punctuation omitted.) *Surman v. Blansett*, 246 Ga. App. 183, 186 (2) (539 SE2d 890) (2000).

[23] HMH submitted an amicus curiae brief in which it argues that summary judgment as to specific performance was improper because it affects HMH's substantive rights by requiring it to distribute taxable income and surrender its right to enforce the restrictive covenant against Pendergast.

[24] (Punctuation omitted.) *Henry*, supra.

[25] See id.

Decided March 14, 2008 —

*Higgins & Dubner, Michael W. Higgins*, for appellant.
*Arnall, Golden & Gregory, Henry M. Perlowski, Matthew T. Covell*, for appellee.
*Aaron P. Tady*, amicus curiae.